UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGIS METRO ASSOCIATES, INC., et al., | Case No.  20-cv-02309-DMR |
| Plaintiffs, | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | Re: Dkt. Nos. 37, 39 |
| NBR COMPANY, LLC, | |
| Defendant. | |

This case involves a contract dispute between a private equity firm and a developer of senior living facilities.  Plaintiffs Regis Metro Associates, Inc. and RMA-CW, LLC (collectively, "RMA"), filed this case in San Francisco Superior Court, alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief against Defendant NBR Company, LLC ("Northbridge").  [Docket No. 1-1.]  Northbridge properly removed the case based on diversity jurisdiction.  [Docket No. 1.]  The parties now cross-move for summary judgment.  *See* Docket Nos. 37 ("RMA Mot."); 39 ("NBR Mot."); 44 ("RMA Opp'n"); 46 ("NBR Opp'n"); 49 ("RMA Reply"); 51 ("NBR Reply").  The court held a hearing on September 9, 2021.  For the reasons stated below, the court denies RMA's motion and grants Northbridge's motion.[1]

## I.      BACKGROUND

The following facts are undisputed except as otherwise noted.[2]  Northbridge develops and

---

[1] The parties also filed multiple administrative motions to seal.  As the court's decision on the pending cross-motions does not rely on the materials that the parties seek to seal, the administrative motions are addressed at the end of this opinion.

[2] RMA's declarations are sparse and the factual assertions in its briefing are largely unsupported.

manages senior housing facilities.  Declaration of James C. Coughlin ("Coughlin Decl.") ¶ 4. [Docket No. 39-1.]  RMA is a private equity firm that sources investors for development projects in the real estate market.  *See id.* ¶ 10; RMA Mot. at 1.

### A.    Northbridge Operations

James Coughlin and Wendy Nowokunski founded Northbridge in 2004.  Coughlin Decl. ¶¶ 2-3.  Northbridge builds new senior housing facilities and acquires existing facilities that can be "repurposed, expanded or improved." *Id.* ¶ 4.  It seeks out investors willing to invest in the developments.  *Id.*  After the facilities are up and running, Northbridge operates the facilities as a property manager.  *Id.* ¶ 5.  According to Coughlin, Northbridge "always co-invests with the investor group so that its incentives are aligned with the rest of the group." *Id.* ¶ 6.  It typically holds ten percent or less of the total equity in each property.  *Id.*

Once a facility is "stabilized" (i.e., profitable on its own), Northbridge sells or recapitalizes the property with new investors.  Coughlin Decl. ¶ 7.  Stabilized properties "attract a different set of investors, such as university endowments, pension funds, or [real estate investment trusts], who want more reliable returns that are typically lower than returns obtained by development capital." *Id.*  Selling and recapitalizing its properties is "critical to Northbridge's business because it is the only way for the initial development investors to recoup their investments and realize their profits." *Id.*  According to Coughlin, Northbridge typically continues to operate the properties after they are sold or recapitalized.  *Id.* ¶ 8.  He expects, as is customary within the industry, that the new investors want Northbridge to retain at least a small ownership interest in the property so that the incentives of Northbridge and the investors align.  *Id.*  Northbridge has retained a "small equity stake" in every property that it has sold or recapitalized.  *Id.* ¶ 9.

### B.    RMA and Northbridge Partnership

RMA and Northbridge started doing business together in 2006, when RMA helped source investors for one of Northbridge's development projects.  Coughlin Decl. ¶ 10.  RMA and the investors it advised continued to invest in Northbridge development projects through 2012.  *Id.* For each project, Northbridge continued to operate and own a small interest in the property once it

United States District Court
Northern District of California

2

was sold or recapitalized.  *Id.* ¶¶ 11-13.  In 2011 or 2012,[3] Michael Potter, the Managing Director of RMA, suggested to Coughlin that the two companies partner to create and manage a real estate private equity fund.  *Id.* ¶ 14; RMA Mot. at 2.  Northbridge agreed, and the parties formed the RMA/Northbridge Fund (the "Fund").  Coughlin Decl. ¶ 14.  The parties set up a new entity, RMA Northbridge LLC, to be the general partner of the new fund, effectively making RMA and Northbridge co-general partners.  Coughlin Decl. ¶ 14; RMA Mot. at 2.

**C.    The Agreement**

As part of forming the Fund and LLC, RMA and Northbridge entered into the Investment Vehicle Formation Agreement ("Agreement"), which is the subject of this lawsuit.  Coughlin Decl. ¶ 15; RMA Mot. at 2.  Both parties attach the Agreement to their motions.  *See* Declaration of Nicholas Fram ("Fram Decl.") Ex. A [Docket No. 39-4]; Declaration of Michael F. Potter ("Potter Decl.") Ex. 1 [Docket No. 56-2].

Relevant here, the Agreement provides that Northbridge must give RMA the option to participate in certain future Northbridge opportunities:

> In the event that Northbridge . . . forms or manages an Eligible Investment Vehicle ["EIV"] on or before the second anniversary of the expiration of the Restricted Period, then [RMA] shall have the option to participate in the [EIV]."[4]

Agreement § 2 ("EIV Provision").  The Agreement defines Eligible Investment Vehicle as "a real estate fund, pooled investment vehicle, separately managed account or other entity of any kind or nature with capital commitments in excess of $25 million and the focus of which is acquiring or developing assisted living and/or memory care facilities."  Agreement § 1(b).

The Agreement further provides for payment of an EIV Formation Fee to RMA if RMA is entitled to an option to participate in an EIV but declines to exercise it:

---

[3] Northbridge's papers say "early 2011" while RMA's motion represents it was 2012.  The discrepancy is not material to this order.

[4] The Agreement defines the "Restricted Period" as RMA Northbridge Fund's investment period as set forth in a separate limited partnership agreement.  Agreement Recital F.  "Under the Fund Partnership Agreement, the Restricted Period commenced on September 25, 2013 and ended on November 9, 2015."  Potter Decl. ¶ 6.  "The second anniversary of the expiration of the Restricted Period is November 9, 2017."  *Id.*  NBR does not challenge any aspect of the Restricted Period in this dispute.

United States District Court
Northern District of California

> In the event that [RMA] fails to exercise the Option to Participate for any reason and [Northbridge] forms or manages an [EIV] . . . then Northbridge shall pay to [RMA] an amount (the "EIV Formation Fee") equal to the sum of (i) 3% of the total capital commitments made to the [EIV] by any investors in RMA Northbridge Fund . . . and (ii) 1% of the total capital commitments made to the [EIV] by other investors."

Agreement § 3 ("EIV Formation Fee").

Importantly, the Agreement includes a carve-out from the option to participate and EIV Formation Fee. Section 4 states that "this Agreement shall in no way impact or have any application what-so-ever to the ongoing business conducted by any Northbridge affiliate." Agreement § 4. (the "ongoing business provision"). "The parties further acknowledge that Northbridge and its affiliates will have . . . certain pre-existing relationships and obligations and that Northbridge shall not be in breach of this Agreement by honoring any such pre-existing relationships." *Id.*

The parties also agreed that "the Option to Participate is personal to [RMA] as currently owned and controlled and is therefore not assignable, and shall also terminate in the event [RMA] is no longer owned and controlled by the RMA Principals as currently owned and controlled." Agreement § 2. Those principals were Michael Potter and Dani Evanson. *Id.* Recital B.

RMA contends without evidentiary support that the purpose of the Agreement was to provide RMA, a "reputable private equity firm," with consideration for entering into a joint venture agreement with a first-time fund operator like Northbridge. RMA Mot. at 2-3. For its part, Northbridge asserts through Coughlin's testimony that the purpose of the Agreement was to "discourage Northbridge from cutting out RMA or going behind its back to raise money" from funders to which RMA had introduced. Coughlin Decl. ¶ 15. The parties signed the Agreement in September 2012 with the understood effective date as one year later in September 2013. *Id.* ¶ 18.

### D.     The Welltower Transaction

In September 2016, Welltower—a large, publicly traded real estate investment trust—approached Coughlin and asked if Northbridge had any properties it was willing to sell. Coughlin Decl. ¶ 19. Northbridge agreed to sell Welltower 95 percent of six Northbridge properties, each of

United States District Court
Northern District of California

1    which Northbridge had operated for years. *Id.* ¶¶ 20-21.[5]  Northbridge retained five percent equity

2    in the properties, per its usual practice and at the request of Welltower.  *See id.* ¶¶ 22-23.

3    Welltower also asked Northbridge to continue operating the properties. *Id.* ¶ 22.  Coughlin

4    explains that Northbridge did not invest any new capital into the Welltower entity; instead, it

5    merely "rolled over" the equity it already owned. *Id.* ¶ 23.

6         Coughlin attests that Northbridge was transparent with RMA about the Welltower

7    Transaction at all times, including that Northbridge would continue to operate the properties and

8    retain a small equity stake in each one.  Coughlin Decl. ¶ 25.  He represents that RMA was

9    "enthusiastic" about the sale because the Fund partially owned one of the sold properties, so RMA

10   and its investors stood to make a large profit from the deal. *Id.* ¶ 26.  Potter prepared a

11   memorandum recommending approval of the transaction to the Fund's advisory committee. *Id.*

12   Coughlin represents that no one at RMA suggested that the transaction would trigger the EIV

13   participation option or the EIV Formation Fee. *Id.* ¶ 27.  Potter, by contrast, testified that he

14   "relied on Northbridge to comply with the Agreement and offer RMA the right to participate in the

15   joint venture with Welltower," but Northbridge did not offer that opportunity.  Potter Decl. ¶ 3.

16        Following the Welltower Transaction, which closed on December 20, 2016, RMA and

17   Northbridge continued to co-manage the Fund until it sold all of its remaining properties in 2019.

18   Coughlin Decl. ¶ 28.  Coughlin states that the first time anyone from RMA told him Northbridge

19   owed an EIV Formation Fee from the Welltower Transaction was when Potter mentioned it in

20   June 2019—many years after the deal had closed. *Id.* ¶ 29.  RMA explains that it could not

21   confirm that the Welltower transaction triggered the EIV formation fee without reviewing the

22   terms of the agreements between Welltower and Northbridge, which it could only get by filing this

23   case and obtaining discovery. *See* RMA Mot. at 4; Potter Decl. ¶ 4.

24

25

26   _____

27   [5] Those six properties were located in Plymouth, Dartmouth, Burlington, Needham, Newburyport, and Tewksbury, Massachusetts.  Coughlin Decl. ¶ 20.  At the hearing, Northbridge's counsel reiterated that these properties were owned and operated in accordance with Northbridge's

28   ongoing business model.  9/9/2021 H'g Tr. ("Tr.") at 11-12 [Docket No. 66.]

1

**E.      Procedural History**

2      On February 18, 2020, RMA filed this action in state court alleging breach of contract,

3 breach of the implied covenant of good faith and fair dealing, and declaratory relief.  On April 6,

4 2021, Northbridge removed the case.  On July 27, 2021, the parties filed these motions for

5 summary judgment.  The parties cross-move on RMA's breach of contract claim.  Northbridge

6 also moves for summary judgment on RMA's claims for breach of the covenant of good faith and

7 fair dealing as well as RMA's claim for declaratory relief.

8 **II.     LEGAL STANDARD**

9      A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

10 fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

11 of establishing the absence of a genuine issue of material fact lies with the moving party.

12 *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477

13 U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-

14 moving party.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.

15 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual issue

16 exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could

17 return a verdict for the nonmoving party.  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200

18 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The

19 court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.

20 *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*,

21 477 U.S. at 255).

22      To defeat summary judgment once the moving party has met its burden, the nonmoving

23 party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as

24 otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of

25 material fact exists.  *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist

26 to support the non-moving party's claims.  *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477

27 U.S. at 252).  A showing that "there is some 'metaphysical doubt' as to the material facts as issue"

28 will not suffice.  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

United States District Court
Northern District of California

6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

Where, as here, the parties have filed cross-motions for summary judgment, "each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation omitted).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

## III.   DISCUSSION

Whether either party is entitled to summary judgment on the breach of contract claim turns on the interpretation of the ongoing business provision in section 4 of the Agreement; that is, whether the Welltower Transaction fell within Northbridge's ongoing business and was therefore exempt from Northbridge's obligation to offer RMA an option to participate in that transaction or pay RMA an EIV Formation Fee.  The court describes the parties' motions before analyzing this lynchpin contractual interpretation issue and applying the contract to the facts.

### A.  RMA's Motion

RMA argues that under the plain language of the Agreement, the Welltower Transaction is an EIV that triggered RMA's option and obligated Northbridge to pay the EIV Formation Fee because RMA did not exercise its option.  RMA Mot. at 5.  Specifically, RMA asserts that Northbridge "form[ed]" and "manage[d]" an "Eligible Investment Vehicle" when it entered into a relationship with Welltower.  Agreement § 2; *see* RMA Mot. at 15-16.  The Welltower Transaction fell within the Agreement's definition of an EIV because it entailed "capital commitments in excess of $25 million," its purpose was to "acquir[e] or develop[]" assisted living and/or memory care facilities" (the six properties at the heart of the deal) and the entities formed amounted to "other entit[ies] of any kind of nature."  Agreement § 1(b); *see* RMA Mot. at 10-11, 16-17; Tr. at 25-26.  The Welltower Transaction occurred around November 2, 2016, which was "before the second anniversary of the expiration of the Restricted Period."  Agreement § 2; *see*

7

RMA Mot. at 9, 16.  RMA contends that as a consequence, the Welltower Transaction precipitated NBR's obligation to offer "the option to participate in the [EIV]" to RMA; however, Northbridge failed to do so.  Agreement § 2; *see* RMA Mot. at 11.  Northbridge was thus obligated to "pay to [RMA] . . . the "EIV Formation Fee."  Agreement § 3; *see* RMA Mot. at 12.  In sum, according to RMA, the "express language" and "every element" of the Agreement entitles it to the EIV formation fee.  RMA Mot. at 18.

In response, Northbridge disputes RMA's interpretation of the Agreement as applied to the Welltower Transaction.  Northbridge contends that particular terms in sections 2 and 3 of the Agreement upon which RMA relies—including the definition of EIV as including "other entity of any kind or nature," "capital commitments," "forms or manages an [EIV]," and "option to participate"—are ambiguous, industry terms of art, or otherwise susceptible to multiple interpretations.  *See generally* NBR Opp'n at 19-25.  Northbridge raises specific evidence of the parties' intentions for the Agreement that undermines RMA's proffered contractual interpretation.

NBR also argues that three unmet contractual conditions preclude operation of the EIV Provision to the Welltower Transaction.  First, the payment of the EIV Formation Fee is payable "as and when RMA Northbridge Partners actually make capital contributions to the [EIV]." Agreement § 3.[6]  According to NBR, "if no RMA Northbridge Partner makes any contribution to any new EIV formed or managed by EIV, then no fee would be due."  NBR Opp'n at 9.  RMA failed to show that any RMA Northbridge Partner was involved in the Transaction, and Welltower was not an RMA Northbridge Partner.   Second, Northbridge argues that the Welltower Transaction falls under the ongoing business provision, which forecloses RMA's entitlement to the option to participate and the EIV Formation Fee.  *Id.* at 10-11.  The ongoing business provision is the subject of Northbridge's cross-motion and is addressed below.  Third, Northbridge argues that the Agreement had terminated five months before the Welltower Transaction closed because Evanson assigned her interest in RMA to a trust for which she and her husband were

---

[6] The Agreement defines "RMA Northbridge Partners" as "any investors in RMA Northbridge Fund and/or their affiliates."  Agreement § 3.

trustees.  NBR Mot. at 19; NBR Opp'n at 10.  Consequently, no option was due at the time of the Welltower Transaction because the Agreement provided that "the Option to Participate is personal to [RMA] as currently owned and controlled" by the RMA principals; the option would "terminate" if RMA was no longer owned and controlled by the principals as identified in the Agreement.  *Id.*; *see* Agreement § 2.  Finally, Northbridge asserts two affirmative defenses that (1) RMA is estopped from seeking the EIV Formation Fee because it knew about and encouraged the Welltower Transaction, and "Northbridge relied on RMA's conduct to its detriment," and (2) RMA otherwise waived its entitlement to a fee because it knew about and approved the Transaction.  NBR Opp'n at 12-16.

     **B.**    **Northbridge's Motion**

     The crux of Northbridge's argument, and the center of the dispute here, is the meaning of section 4 of the Agreement, which excludes Northbridge's ongoing business from contractual obligations.  Northbridge argues that the plain language of the Agreement exempts transactions like the Welltower Transaction, which was "core to Northbridge's ongoing business."  NBR Mot. at 13.[7]  Northbridge explains that its ongoing business is "developing and operating senior housing properties" in which it "owned at least a small percentage." *Id.* at 15; *see also id.* at 5 (discussing "Northbridge's business model"). Part of this business entails "arranging for new investors to buy out the stake of existing investors after the properties have stabilized." *Id.*  After the sale of the properties, the new owners, however, "might want Northbridge to continue to operate a property and continue to own at least a small stake to align its incentives." *Id.* at 16.[8] According to Northbridge, the Welltower Transaction proceeded in exactly this manner: "Welltower approached Northbridge seeking to buy six properties that Northbridge operated and in which it owned a stake . . . [;] Welltower asked that Northbridge continue to operate each property after the sale and continue to own a portion of each property." *Id.* at 17.  Thus, the

---

[7] Northbridge makes the same argument on the ongoing business exception in its opposition to RMA's motion and cross-references to its own motion.  *See* NBR Opp'n at 10-12.

[8] As addressed below, Northbridge cites to deposition testimony establishing that RMA's principals knew that this was Northbridge's ongoing business.  NBR Mot. at 15-17.

United States District Court
Northern District of California

1  Welltower Transaction was "nothing more and nothing less than Northbridge conducting its

2  ongoing business . . . activity specifically exempt from the EIV Agreement." *Id.* Furthermore,

3  Northbridge asserts that the Agreement was not intended to "constrain Northbridge's ability to sell

4  or restructure its ownership interest in properties it already owned." *Id*. at 3.  The Agreement only

5  applies, Northbridge argues, to "additional" facilities; because the Welltower Transaction included

6  six properties that Northbridge already operated and partially owned, they were not additional

7  facilities, thereby foreclosing operation of the Agreement.  *Id.*

8      Northbridge elaborated on its theory at the hearing.  Counsel stated that the Welltower

9  Transaction was "part of the ongoing business . . . because it was part and parcel of the business

10  model that Northbridge had worked to develop."  Tr. at 13.; *see also id.* at 14 ("I would just say

11  that the question that we presented in our brief is whether the sale to Welltower was part of

12  Northbridge's ongoing business.").  Counsel explained the Welltower Transaction as follows:

13      Welltower bought six properties that Northbridge already owned and operated.  This was
       not a situation where Welltower and Northbridge went out and purchased new properties . .
14      . . And the sale proceeded in exactly the way that Northbridge anticipated and everyone
       anticipated the sale would proceed.  Northbridge continued to operate the properties and
15      continued—it rolled over the small percentage it already owned and continued to own that.

16  Tr. at 15.

17      Later, counsel reiterated: "Welltower didn't promise to give a certain amount of money to

18  Northbridge for Northbridge to go out and buy properties.  Welltower was sold properties that

19  Northbridge was already managing.  Welltower was a purchaser from Northbridge, not an investor

20  with Northbridge."  Tr. at 45.  By contrast, "[i]f Northbridge had gone out and raised a fund . . .

21  [and] set up a fund structure in which Northbridge is paid for its investment management

22  expertise, and used that money to go purchase additional properties," that would trigger the EIV

23  option to participate and formation fee.  Tr. at 18.

24      RMA rejects Northbridge's interpretation of "ongoing business" without offering a

25  different meaning.  RMA simply states that "NBR does not . . . demonstrate how the payment of

26  the EIV Fee constitutes an impediment to the 'ongoing business' of NBR."  RMA Opp'n at 5; s*ee*

27  *also* RMA Reply at 3 ("In short, the Agreement does not impair NBR's ability to do anything; it

28  simply provides that a fee is due upon a covered transaction.").  It also contends without

evidentiary support that under the Agreement, "the Fee can come due regardless of whether or not the investor is an RMA-sourced investor," and that "the Agreement in no way whatsoever impaired [Northbridge's] obligations to existing investors."  RMA Opp'n at 4.

RMA's argument that payment of the formation fee would not be an "impediment" to Northbridge's ongoing business is off-point.  The relevant question is whether the Welltower Transaction fell within Northbridge's "ongoing business" and is therefore contractually exempt from the option to participate and EIV Formation Fee obligations.  To that point, RMA merely counters that "NBR does not . . . establish that part of its 'Ongoing Business' was investment in senior housing facilities in a structure where NBR stood to reap millions of dollars in promote fees."  RMA Opp'n at 5.  RMA does not offer any evidence to substantiate this conclusory assertion or contradict Northbridge's interpretation of the "ongoing business" provision.

At the hearing, the court pressed RMA, pointing out that "RMA didn't give me any alternate reading or any evidence to support an alternate reading" of the Agreement.  Tr. at 20.  RMA's counsel responded by directing the court back to "the written contract, the integrated contract that no one has complained is ambiguous."  *Id.* at 20-21.  Counsel asserted that under Northbridge's interpretation of "ongoing business," "it would make it impossible for a fee to ever come due under this agreement because their claim is that this is what they do.  And so any time they do it, a fee could never come due.  And that is illogical.  It . . . just ignores . . . the purpose of the Agreement itself."  Tr. at 19.  RMA does not point to any evidence establishing the Agreement's "purpose," nor does it offer an alternative reading of "ongoing business."  Instead, counsel returned to RMA's primary argument that the Welltower Transaction involved the formation of a "joint venture," which constituted an "entity of any kind or nature that invests in senior housing facilities with more than $25 million."  *Id.* at 21.  Therefore, "that's the prima facie case under this agreement as to why the fee is due."  *Id.* at 23; *see also id.* at 26 ("we believe that the joint venture . . . fits squarely into that definition").

Boiled down, the determinative issue is the contractual meaning of Northbridge's "ongoing business."  The court therefore turns to the principles of contract interpretation in order to construe the ongoing business provision.

United States District Court
Northern District of California

1

**C.      Legal Standard for Contract Interpretation**

2

Under California law, "[a] contract must be so interpreted as to give effect to the mutual

3

intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636.[9] "When a

4

contract is reduced to writing, the intention of the parties is to be ascertained from the writing

5

alone, if possible." *Id.* § 1639; *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995).

6

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably

7

practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641.   "The language of

8

a contract is to govern its interpretation, if the language is clear and explicit, and does not involve

9

an absurdity." *Id.* § 1638.   "The fundamental goal of contractual interpretation is to give effect to

10

the mutual intention of the parties." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th

11

Cir. 2006); *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998).

12

"The 'clear and explicit' meaning of [the written] provisions, interpreted in their 'ordinary

13

and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to

14

them by usage,' controls judicial interpretation." *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998)

15

(quoting Cal. Civ. Code §§ 1638, 1644).   The language of a contract is considered ambiguous if it

16

is "reasonably susceptible" to more than one interpretation. *Winet v. Price*, 4 Cal. App. 4th 1159,

17

1165 (1994). "[I]f the meaning a layperson would ascribe to contract language is not ambiguous,

18

[courts] apply that meaning." *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th

19

744, 752 (2017).

20

Contract interpretation is a question of law. *Waller*, 11 Cal. 4th at 17; *Wolf v. Super. Ct.*,

21

114 Cal. App. 4th 1343, 1351 (2004).  "Summary judgment is appropriate when the contract terms

22

are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King*

23

*Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988); *see also Miller*, 454 F.3d at 990 ("If, after

24

considering the language of the contract and any admissible extrinsic evidence, the meaning of the

25

contract is unambiguous, a court may properly interpret it on a motion for summary judgment.").

26

27

_____

[9] California law applies to federal diversity cases arising in California. *Allstate Ins. Co. v. Smith*,

28

929 F.2d 447, 449 (9th Cir. 1991).

United States District Court
Northern District of California

1   "Interpretation of a written instrument becomes solely a judicial function only when it is based on

2   the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a

3   determination was made based on incompetent evidence."  *City of Hope Nat'l Med. Ctr. v.*

4   *Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008); *accord Cty. of Fresno v. Fresno Deputy Sheriff's*

5   *Ass'n*, 51 Cal. App. 5th 282, 288 (2020) ("It is a judicial function to interpret a contract or written

6   document unless the interpretation turns upon the credibility of extrinsic evidence.").  However,

7   "[w]here the interpretation of contractual language turns on a question of the credibility of

8   *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function.  As

9   trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly

10   admitted to interpret the language of a contract." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 913

11   (1998) (emphasis in original, citations omitted).

12            **D.        The Contractual Language**

13            The court first evaluates the language of section 4 to ascertain the mutual intentions of the

14   parties at the time they executed the Agreement.  *See* Cal. Civ. Code § 1636.  The Agreement

15   itself does not define Northbridge's "ongoing business."  Nevertheless, Northbridge points to the

16   plain language of the Agreement that it "shall in no way impact or have any application what-so-

17   ever to the ongoing business conducted by any Northbridge affiliate."  Agreement § 4.

18   Northbridge avers that this provision makes "crystal clear that all of Northbridge's 'ongoing

19   business' would be completely exempt from the limited restraint of the EIV Agreement."  NBR

20   Mot. at 14.  Northbridge asserts that this provision allowed it to "remain[] free to meet its

21   obligations to investors in properties it already operated and owned," such as the properties

22   involved in the Welltower Transaction.  *Id.*

23            RMA does not substantively respond; it asserts in a conclusory fashion that "[t]he

24   Agreement did nothing to proscribe the conduct of the parties" or "[c]onstrain Northbridge's

25   [r]ight to [s]ell [i]ts [p]roperties."  *See* RMA Opp'n at 4.  The court does not understand RMA's

26   argument or its relevance to interpreting the explicit language of section 4, to which RMA fails to

27   offer any contrary construction.

28            "Words in a contract are to be understood in their usual sense." *Mountain Air*, 3 Cal. 5th

United States District Court
Northern District of California

at 744.  Because the parties did not define the term in the Agreement, the court "look[s] to the dictionary definition to determine the ordinary and popular meaning."  *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007); *see Scott v. Cont'l Ins. Co.*, 44 Cal. App. 4th 24, 30 (1996) ("It is thus safe to say that the 'ordinary' sense of a word is to be found in its dictionary definition.").  Black's Law Dictionary defines "business" as "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Business*, Black's Law Dictionary (11th ed. 2019).  Merriam-Webster's Dictionary likewise defines "business" as a "usually commercial or mercantile activity engaged in as a means of livelihood."  *Business*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/business.  While Black's dictionary does not define "ongoing," Merriam-Webster defines it as "being actually in process."  *Ongoing*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/ongoing; *see also Ongoing,* American-Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=ongoing (defining the word as "Currently taking place" or "In progress or evolving").

Placing the two words together, the court finds that the ordinary meaning of Northbridge's "ongoing business" is Northbridge's commercial activities that are in process.  Thus, the clear and explicit language of the ongoing business provision refers to Northbridge's commercial activities that it was conducting as part of its business at the time it entered into the Agreement.

The court further interprets Section 4 in light of the Agreement as a whole, *see* Cal. Civ. Code § 1641, and finds that certain recitals help elucidate the meaning of the ongoing business provision.  "[R]ecitals may have a material influence in construing the contract and determining the intent of the parties, and in such respect they should, so far as possible, be reconciled with the operative clauses and be given effect."  *Powertech Tech., Inc. v. Tessera, Inc.*, No. C10-945-CW, 2013 WL 12324116, at *10 (N.D. Cal. Apr. 15, 2013) (quoting 17A Am. Jur. 2d Contracts § 393 (2012)).

Recital G provides that "[s]ubsequent to the Restricted Period, the Northbridge Principals and/or the RMA Principals, either directly or indirectly through affiliated entities, may decide to form one or more investment vehicles to acquire and/or develop additional assisted living and/or

14

memory care facilities."  Recital H further explains that "RMA and Northbridge now desire to

enter into this Agreement with respect to investment vehicles formed in the future as described

herein to acquire and/or develop *additional* assisted living and/or memory care facilities"

(emphasis added).  Northbridge argues that Recital H evinces the parties' intent for the Agreement

"to apply only to Northbridge's acquisition of new properties," and that the contract "was not

intended to be a wide-ranging constraint on Northbridge's ability to operate and sell properties it

already owned."  NBR Mot. at 14.  At the hearing, Northbridge's counsel elaborated that "if

Northbridge had gone out and formed additional investment vehicles to acquire additional

properties after the effective date, then the Agreement would apply."  Tr. at 5; *see also id*. at 18.

The Welltower Transaction, by contrast, entailed formation of an entity that "held title to

properties that Northbridge had already owned and that Northbridge had operated for years."  *Id*.

at 18.  That entity "didn't hold title to additional properties, as it says in Recital H."  *Id*.

RMA's brief did not offer a different interpretation of Recital H.  At the hearing, RMA's

counsel suggested for the first time that "you can look at Recital G to inform how you should

interpret Recital H."  Tr. at 23; *see also id.* at 24 (pointing to the words "additional properties" in

Recital G and Recital H).  RMA's counsel also gestured to Recital D, which provides that "RMA

Northbridge Fund is being formed in order to acquire and/or develop assisted living facilities and

memory care facilities . . . ."  RMA does not explain how these Recitals should be read together to

demonstrate the parties' intent as to the ongoing business provision.  It does not even explain

whether those recitals support its position.[10]  The court will not speculate or strain to find any

---

[10] On reply, RMA inappropriately raised a new argument by briefly directing the court to Recital I.
*See* RMA Reply at 3.  That recital provides, "RMA and Northbridge acknowledge that this
Agreement shall in no way impact or have any application what-so-ever to the advisory service
business conducted by any Northbridge affiliate."  Agreement at Recital I.  RMA asserts without
argument that "NBR's Joint Venture with Welltower is not part of its 'advisory service business'
nor has NBR ever argued as much." RMA Reply at 3.  At the hearing, RMA's counsel sought to
justify the recital as "explain[ing] what ongoing business means so that we don't run into the
situation . . . [where] the ongoing business . . . could mean anything or nothing, whatever business
Northbridge decides to get into." Tr. at 39-40.  The Agreement does not define Northbridge's
"advisory service business," nor does RMA offer any explanation.  The court will not entertain an
argument raised for the first time on reply, let alone one that is unsupported by evidence.

United States District Court
Northern District of California

1    ambiguity or conflict between the Recitals and section 4, especially when RMA offered no

2    argument to that effect.

3         The court finds as a matter of law that the Agreement unambiguously demonstrates the

4    parties' intent to give RMA an option or an EIV Formation Fee for an EIV involving the

5    acquisition or development of future additional facilities— i.e., an EIV that did not involve

6    Northbridge's ongoing business "what-so-ever" as of the Agreement's effective date.  The parties

7    intended to exclude transactions that involved existing facilities already owned and operated by

8    Northbridge that fell within Northbridge's ongoing business model.  In other words, the

9    Agreement is meant to cover new investment vehicles that added to Northbridge's portfolio of

10   assisted living and memory care facilities, and to exempt pre-existing facilities that Northbridge

11   operated in accordance with its regular commercial practices.  This interpretation permits the

12   contract to be read harmoniously and as a whole and to account for the repeated use of the phrase

13   "additional . . . facilities" in the Recitals.  A reading that does not limit the ongoing business

14   exception to transactions dealing with Northbridge's pre-existing, rather than "additional . . .

15   facilities," would render the latter phrase mere surplusage.  *See Boghos v. Certain Underwriters at*

16   *Lloyd's of London*, 36 Cal. 4th 495, 503 (2005) (courts "disfavor constructions of contractual

17   provisions that would render other provisions surplusage").

18        Having established the clear and unambiguous meaning of the Agreement, the court now

19   applies the Agreement to the Welltower Transaction to determine whether the undisputed facts

20   substantiate Northbridge's contention that the transaction was part and parcel of its ongoing

21   business involving pre-existing facilities and was therefore exempt from the option and EIV

22   Formation Fee requirements.

23        **E.**     **Application of the Agreement to the Welltower Transaction**

24        Northbridge supports its argument about the ongoing business provision with a declaration

25   from its principal, James Coughlin and portions from the depositions of RMA principals Michael

26   Potter and Dani Evanson.  *See* Coughlin Decl.; Deposition of Dani Evanson, Fram Decl. Ex. C

27   ("Evanson Dep."); Deposition of Michael Potter, Fram Decl. Ex. J ("Potter Decl.").  RMA does

28   not provide contrary evidence about the nature of Northbridge's ongoing business; instead, it filed

a separate statement of objections to some of Northbridge's evidence, including the Coughlin Declaration ("RMA Obj.").[11]

In order to decide this motion, the court need only consider evidence characterizing Northbridge's ongoing business and the nature of the Welltower Transaction; RMA's objections to evidence offered for other purposes are thus denied as moot.[12] The court overrules RMA's objections. First, RMA objects to portions of Coughlin's declaration as irrelevant. RMA Obj. at 7-14. These objections are conclusory and are simply "boilerplate one-word objections" that cite the pertinent Federal Rule of Evidence without explaining why each piece of evidence is irrelevant. *See Sandoval v. Cty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (ruling that sustaining "boilerplate one-word objections," "which had the effect of striking crucial evidence

---

[11] RMA's fourteen-page statement of objections is procedurally improper because the objections are not contained within the opposition brief. *See* N.D. Cal. Civ. L.R. 7-3(a). ("Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum. . . . [S]uch brief or memorandum may not exceed 25 pages of text."). The court nevertheless considers the objections because the combination of RMA's statement of objections and its six-page opposition brief falls within the 25 page limit. The court only considers RMA's objections to evidence proffered for the interpretation of the ongoing business provision—not those related to other arguments by Northbridge that the court does not reach.

[12] Particular portions of the Coughlin Declaration seek to illustrate the parties' intended meaning for the Agreement at the time it was executed. Such evidence is parol evidence, which ordinarily "may not be admitted to vary, alter or add to the terms of an integrated written instrument." *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004). However, parol evidence may be admitted to construe an ambiguity in an integrated contract. *Id.*; *Winet v. Price*, 4 Cal. App. 4th at 1159, 1165 (1992). Neither party argued that the "ongoing business" provision is ambiguous, and the court finds above that it is clear and unambiguous. Therefore, Coughlin's extrinsic evidence of the parties' intent is inadmissible and the court disregards it. Accordingly RMA's objections to paragraphs 15, 16, and 17 of Coughlin's declaration as parol evidence are denied as moot.

Northbridge also offers a declaration from expert Jeffrey A. Rothbart to explain particular provisions of the Agreement in light of standard real estate trade usage and to show that Northbridge's business model was based on common industry standards. This is evidence is also parol evidence, which may be admitted to interpret an ambiguity and show that "words in a contract have by trade usage acquired a different meaning than their plain, ordinary, popular or legal meaning." *Gen. Motors Corp. v. Super. Ct.*, 12 Cal. App. 435, 442 n.3 (1993). There is no indication that the parties chose to use "ongoing business" as technical term of art or afforded it some different meaning based on industry usage distinct from its ordinary sense. Moreover, Rothbart does not possess any specific, relevant knowledge of Northbridge's ongoing business. For these reasons, the Rothbart declaration is irrelevant to the determinative issue in this motion, therefore the court will not consider it. *See* RMA Obj. at 1-2.

United States District Court
Northern District of California

from the summary judgment record, was an abuse of discretion"). The bar for establishing relevance is relatively low on summary judgment. *See id.* at 666 (police and medical expert reports in prisoner civil rights suit "go[] to the central issues in the case and [are] therefore more than sufficient to clear the low bar of relevance"). Coughlin's declaration is relevant to determining Northbridge's ongoing business and to applying that term to the Welltower Transaction.

RMA's boilerplate, one-word personal knowledge objections are overruled for similar reasons. Additionally, Rule 56 permits objections that cited material "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "Consequently, the focus of an objection at the summary judgment stage is not 'the admissibility of the evidence's form' but on the 'admissibility of its contents.'" *Dillon v. Cont'l Cas. Co.*, 278 F. Supp. 3d 1132, 1137 (N.D. Cal. 2017) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). Statements made without the declarant's personal knowledge "are not facts and can only be considered as arguments." *Id.* (quotation omitted). "Instead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency because a court can award summary judgment only when there is no genuine dispute of material fact." *Id.* (quotation omitted). RMA does not explain which portions of Coughlin's statements it asserts are not based on his personal knowledge. The court will not speculate about the specifics of RMA's objections, especially because Coughlin establishes his personal knowledge at the outset of the declaration and his statements regarding Northbridge's ongoing business and the Welltower Transaction all appear to be made on personal knowledge.[13]

The facts describing Northbridge's ongoing business are undisputed. Coughlin's

---

[13] RMA's hearsay objection to paragraph 19—in which Coughlin describes a statement he received from a Welltower employee in September 2016—is denied as moot because the court does not rely on that statement in its analysis. RMA also objects to portions of Wendy Nowokunski's declaration as irrelevant and lacking personal knowledge. RMA Obj. at 5-7; *see* Nowokunski Decl. ¶¶ 4-10. As Northbridge does not offer the Nowokunski Declaration in support of its argument on the ongoing business provision and the court does not rely on it, the court denies the objection as moot.

declaration explains Northbridge's ongoing business.  Coughlin stated that, "[s]ince its inception, Northbridge has been in the business of developing and managing senior housing."  Coughlin Decl. ¶ 4.  First, Northbridge identifies opportunities to build new facilities from the ground up." *Id.*  Next, "[o]nce the property is up and running, Northbridge operates the facility" and "is paid a property management fee for these services." *Id.* ¶ 5.  Once the property is profitable on its own . . . Northbridge seeks to sell or recapitalize the property with a new set of investors." *Id.* ¶ 7.  Coughlin expects that "the new investor or investors will want Northbridge to retain at least a small ownership stake in each property." *Id.*    ¶ 8.

At deposition, RMA's principals support that they understood this to be the nature of Northbridge's ongoing business at the time they signed the Agreement in 2012.  Evanson stated that when she first learned about Northbridge in 2010, she understood that their business was "operators of senior housing."  Evanson Dep. at 46.  She admitted that she understood that Northbridge invested in and owned a stake in senior housing facilities. *Id.*  She also knew "for a long time" that it was customary for an operator like Northbridge to continuing managing and operating facilities after the sale. *Id.* at 93.  Evanson said that Northbridge's principals "for many years described that buyers in senior housing keep strong operators in place for operating properties." *Id.* at 98.  She confirmed that Northbridge develops and acquires senior housing "for the purpose of operating senior housing." *Id.* at 191.

Similarly, Potter stated that in 2012, he "knew that Northbridge was involved in the development and acquisition of assisted living facilities."  Potter Dep. at 201.  He admitted that he understood at that time that Northbridge's business including buying properties, bringing them to stabilization, and then selling them. *Id.* at 334.

RMA does not contest Northbridge's evidence or adduce contrary evidence to characterize Northbridge's ongoing business differently.  The undisputed evidence therefore establishes that at the time they entered into the Agreement, all parties understood that Northbridge's ongoing business entailed acquiring and developing senior living facilities, stabilizing them, and then selling them to a third-party investor while retaining a small stake in the properties and continuing to operate them.

United States District Court
Northern District of California

Next, Northbridge provides undisputed evidence that the Welltower Transaction fell within Northbridge's ongoing business and did not involve the acquisition or development of additional facilities.  Welltower approached Northbridge "to see if Northbridge had any properties it was willing to sell." Coughlin Decl. ¶ 19.  Northbridge identified six properties each of which it had already operated "for years."  *Id.* ¶ 21.[14]  For the six properties involved in the Welltower Transaction, "[m]ost had been recapitalized at some point" but that "Northbridge retained a portion of the equity of the property" thereafter.  *Id*.  Welltower purchased 95 percent of each property while Northbridge retained five percent of its ownership equity in each.  *Id.* ¶¶ 22-23.  Welltower also asked that Northbridge continue to operate each of the six properties.  *Id.* ¶ 22.

As RMA does not offer any contrary evidence, the undisputed record establishes that in the Welltower Transaction, Northbridge sold its ownership in six facilities it partially owned and operated while retaining a small equity stake and the rights to continue operating the facilities after the transaction concluded.  As such, the Welltower Transaction was part of Northbridge's ongoing business.  It is also uncontroverted that the six properties were already part of Northbridge's portfolio and were not "additional" facilities that were newly acquired or developed.  The Welltower Transaction therefore falls squarely within the parties' undisputed understanding of Northbridge's ongoing business and the exception in section 4 of the Agreement.  *See* Coughlin

---

[14] Coughlin states that Northbridge operated and owned at least a small percentage of three of the properties in the Welltower Transaction prior to 2012—Stafford Hill in Plymouth, Autumn Glen at Dartmouth, and Stonebridge at Burlington.  Coughlin Decl. ¶¶ 10-11.  He also states that Northbridge operated and partially owned Avita of Needham and Bayberry at Emerald Court at the time the Agreement was signed.  *Id.* ¶ 12.  He does not specifically attest that Northbridge owned the sixth property, Avita of Newburyport, but states that "Northbridge had operated each of these six properties for years."  *Id.* ¶ 21.  At the hearing, Northbridge's counsel asserted that "[i]t is in the record that Northbridge owned at least a small percentage of [Avita of Newburyport], and it is also in the record that Northbridge operated it."  Tr. at 17.  RMA does not dispute that Northbridge had previously owned and operated the Newburyport facility at the time the Agreement was signed.  Because RMA fails to raise the issue or adduce any record evidence on the Newburyport facility's ownership, the court rules that the evidence demonstrates that all the six properties involved in the Welltower Transaction were existing facilities and not future acquisitions or "additional . . . facilities" for the purposes of the Agreement.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

United States District Court
Northern District of California

1   Decl. ¶¶ 4-7; Evanson Dep. at 46, 93, 98, 191; Potter Dep. at 202, 334.   As a result, Northbridge

2   was not obligated to offer an option to RMA to participate in the Transaction and pay the EIV

3   Formation Fee.   Because no triable issues remain on this determinative issue, the court grants

4   Northbridge's motion for summary judgment on the breach of contract claim.[15]

5          **F.      Remaining Claims**

6           RMA also brings a claim for breach of the implied covenant of good faith and fair dealing.

7   Northbridge argues that this claim is duplicative of RMA's breach of contract claim.  RMA does

8   not respond to this point.  Northbridge is correct that the allegations supporting the breach of

9   covenant claim are identical to the allegations underlying the breach of contract claim.  The breach

10  of covenant claim therefore fails.  *See Congleton v. Nat'l Union Fire Ins. Co.*, 189 Cal. App. 3d

11  51, 59 (1987) ("[B]reach of the implied covenant of good faith and fair dealing involves

12  something beyond breach of the contractual duty itself" (internal quotation marks and citation

13  omitted)); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (1990) ("If

14  the allegations [supporting a breach of covenant claim] do not go beyond the statement of a mere

15  contract breach and, relying on the same alleged acts, simply seek the same damages or other

16  relief already claimed in a companion contract cause of action, they may be disregarded as

17  superfluous as no additional claim is actually stated.").  RMA also brings a claim for declaratory

18  relief that is wholly derivative of its breach of contract claim.  Since the predicate claim fails,

19  Northbridge is also entitled to summary judgment on this claim.

20  **IV.   MOTIONS TO SEAL**

21          The parties each filed administrative motions to seal portions of their briefing and

22  evidence.  [Docket Nos. 36, 38, 43, 45, 50, 55, 58.][16]  They assert that these materials contain

23

24  [15] By consequence, the court does not reach Northbridge's additional arguments in support of its
    motion or in opposition to RMA's motion.  The court also need not reach RMA's arguments
25  regarding interpretation of other provisions in the contract because regardless of their meaning, the
    ongoing business provision exempted the Welltower Transaction from Northbridge's obligations
26  under the Agreement.

27  [16] The court ordered the parties to refile their original administrative motions in accordance with
    N.D. Cal. Civ. L.R. 79-5(b) and (d), which require that motions to seal be narrowly tailored and
28  for unredacted documents filed to indicate those portions of the documents omitted from the

competitively sensitive information, are subject to confidentiality agreements, or were designated as confidential in the parties' stipulated protective order.  Northbridge seeks to seal the following documents: Exhibits B, E, F, H, and I to the Fram Declaration; Exhibits 2, 3, 6, and portions of Exhibit 1 to the L. Peter Ryan Declaration in support of RMA's Motion for Summary Judgment; Exhibit B to the James C. Coughlin Declaration in Support of NBR's Opposition; Exhibit T to the Nicholas D. Fram Declaration in Support of NBR's Opposition, and Exhibit U to the Nicholas D. Fram Declaration in support of NBR's Reply.  NBR Suppl. Admin. Mot. [Docket 58].  RMA does not oppose Northbridge's motion and also seeks to seal Exhibits 2, 3, 6, and portions of Exhibit 1 to the Ryan Declaration.[17]  [Docket No. 55.]  Both parties further seek to seal text in their briefing that refers or cites to these documents.

The court did not rely on any of the documents or portions of deposition testimony the parties seek to seal for the purposes of deciding the cross-motions.  Nevertheless, the court must rule on the motions to seal and so evaluates the arguments that the parties offered in their previously-filed administrative motions in addition to the supplemental motions

In assessing whether documents may be filed under seal, there is "a strong presumption in favor of access."  *Foltz v. State Farm Mut. Auto. Ins.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  The Ninth Circuit established standards governing requests to seal in *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1180-81 (9th Cir. 2006).  In accordance with the strong public policy favoring access to court records, "[a] party seeking to seal a judicial record . . . bears the burden of overcoming this strong presumption by meeting the 'compelling reasons' standard."  *Id.* at 1178.  "Under this stringent standard, a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture.'"  *Ctr.*

_____

redacted versions.  The parties refiled their administrative motions with a narrower set of documents and deposition testimony to be sealed.  [Docket Nos. 55, 58.]  The court addresses these supplemental motions but considers the arguments the parties made in their previous motions.

[17] Northbridge provides a declaration from James Coughlin in support of RMA's motion to seal the documents in the Ryan Declaration, in which Coughlin describes the confidential and commercially sensitive nature of the materials.  [Docket No. 42.]  *See* Civ. L.R. 79-5(f) (requiring declaration from designating party in support of filing party's motion to seal).

United States District Court
Northern District of California

*for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (quoting *Kamakana*, 447 F.3d at 1179). Those reasons must "outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'" *Kamakana*, 447 F.3d at 1178-79 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)). The court must "conscientiously balance[ ] the competing interests of the public and the party who seeks to keep" the records secret. *Id.* at 1179.

The Ninth Circuit has "carved out an exception to the presumption of access to judicial records" for "court records attached only to non-dispositive motions." *Id.* (quoting *Foltz*, 331 F.3d at 1135). The court reasoned that "the public has less of a need for access to court records attached only to non-dispositive motions because those documents are often 'unrelated, or only tangentially related, to the underlying cause of action.'" *Id.* (quoting Foltz, 331 F.3d at 1135). "A 'good cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-dispositive motions." *Id.* at 1180 (citing *Foltz*, 331 F.3d at 1135). The Ninth Circuit recently distinguished "dispositive" and "non-dispositive" motions. *Ctr. for Auto Safety*, 809 F.3d at 1097-98. It explained that these terms are not "mechanical classifications" and that "public access [to judicial records] will turn on whether the motion is more than tangentially related to the merits of a case." *Id.* at 1097, 1101. Therefore, a party must satisfy the more demanding "compelling reasons" standard to seal a motion that is more than tangentially related to the merits of the case. *Id.* at 1101-02.

The pending cross-motions for summary judgment are "more than tangentially related to the merits of" the case. Accordingly, the "compelling reasons" standard applies to the pending administrative motions to seal. Northbridge does not dispute that the compelling reasons standard applies.

In general, compelling reasons exist to seal materials that are "sources of business information that might harm a litigant's competitive standing." *Ctr. for Auto Safety*, 809 F.3d at 1097 (quoting *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 599 (1978)). Such documents can include "trade secrets, marketing strategies, product development plans, detailed product-specific financial information, customer information, internal reports and other such materials." *In re*

*Google Location History Litig.*, 514 F. Supp. 3d 1147, 1162 (N.D. Cal. 2021).  Furthermore, "confidential business information in the form of license agreements, financial terms, details of confidential licensing negotiations, and business strategies satisfies the "compelling reasons" standard."  *Baird v. BlackRock Inst. Tr. Co.*, 403 F. Supp. 3d 765, 792 (N.D. Cal. 2019); *see also Stafford v. Rite Aid Corp.*, No. 17-cv-1340-AJB-JLB, 2019 WL 3818015, at *1 (S.D. Cal. Aug. 14, 2019) (granting motion to seal confidential agreements between a party and a third-party).

Northbridge's motion to seal is granted because compelling reasons to seal these records outweighs the public interest in accessing materials that the court did not rely on in its summary judgment decision.  All of the documents contain sensitive business information or may be subject to confidentiality agreements.  Specifically, the exhibits attached to the Fram Declaration contain sensitive business information including the identities of investors in the Fund; quotations from the Fund's Limited Partnership Agreement; internal data including valuation, pricing, operations, and ownership information for one of Northbridge's properties, and details about the Transaction that could reveal sensitive commercial information about Welltower and Northbridge.  [Docket No. 38.]  Some of these materials include documents covered by a confidentiality agreement between Welltower and Northbridge.  *Id.*  The exhibits attached to the Coughlin and Fram Declarations supporting Northbridge's opposition also contain drafts of confidential agreements between Northbridge and RMA in setting up the Fund.  [Docket No. 45.]  The exhibit attached to the Fram Declaration supporting Northbridge's reply contains confidential business information that could damage Northbridge's reputation.  [Docket No. 50.]  And per Coughlin's declaration regarding sealing exhibits in the Ryan Declaration, those documents also contain information that are subject to confidentiality agreements between Northbridge and Welltower.  [Docket No. 42.] The parties have also represented that they met and conferred and narrowly tailored their requests to seal these exhibits.  *See* Civ. L.R. 79-5(b) (a request to file documents under seal "must be narrowly tailored to seek sealing only of sealable material").

While compelling reasons support sealing these sensitive business-related materials, the public interest in accessing them is relatively low as the court did not rely on any of the documents for the purposes of deciding this motion.  *See Lesnik v. Eisenmann SE*, No. 16-cv-01120-LHK,

2021 WL 2093062, at *2 (N.D. Cal. Feb. 12, 2021) (granting motion to seal where court did not rely on any of the information the parties sought to seal and "therefore, the public interest in access to this information is minimal"); *see also X One, Inc. v. Uber Techs., Inc.*, No. 16-cv-06050-LHK, 2020 WL 718310 (N.D. Cal. Feb. 12, 2020) (granting motion to seal documents related to motions that the court denied as moot).

Northbridge's motion to seal portions of its motion and opposition briefs that rely on these sealed materials is also granted, as the court finds that the redactions are narrowly tailored and minimal. *See* Civ. L.R. 79-5(e) (providing that "[o]nly in rare circumstances should a party seek to file portions of a pleading or brief under seal"); *Cisco Sys., Inc. v. Chung*, No. 19-cv-07562-PJH, 2020 WL 7495085, at *6 (N.D. Cal. Dec. 21, 2020) ("[T]o the extent [Defendants'] opening brief reflects information in the disclosure that the court determined is subject to sealing, such opening brief portions must also be sealed").

The court also grants RMA's administrative motion to seal with respect to the exhibits to the Ryan Declaration that the court already addressed with respect to Northbridge's motion. However, the court denies without prejudice RMA's motion to seal its motion and opposition. Unlike Northbridge, RMA seeks to redact significant portions of its briefs, including statements of legal arguments that are not directly supported by sealed materials. RMA's request exceeds the rare circumstances authorized by Civil Local Rule 79-5(e) to seal portions of a brief. Within seven days—i.e., by **February 4, 2022**—RMA shall re-file *only* its motion for summary judgment and opposition briefs, without accompanying declarations. RMA can choose to re-file the motion and opposition without redactions. Should it seek to redact any confidential information in its motion and opposition briefs, it must file a new administrative motion to seal that complies with the requirements in Civil Local Rule 79-5 and attach the unredacted briefs as an exhibit to the administrative motion. RMA may only redact text that is explicitly confidential or otherwise sealable information and is not legal argument.

## V.   CONCLUSION

For the foregoing reasons, the court grants summary judgment to Northbridge and denies summary judgment to RMA. Northbridge's supplemental administrative motion to seal is granted.

1    RMA's supplemental administrative motion is granted in part and denied in part without

2    prejudice.  If RMA chooses to file a new administrative motion consistent with this order, it must

3    do so in seven days.  If it does not, it must file unredacted briefs by the same deadline.  The other

4    pending administrative motions to seal are terminated.  The clerk is directed to render judgment in

5    favor of Northbridge and close the case.

6

7        **IT IS SO ORDERED.**

8    Dated: January 28, 2022



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge